UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE


BRISTOL ANESTHESIA SERVICES, P.C., )
             Plaintiff, )
                                )
v.                                )       No. 2:15-CV-17
                                )
CARILION CLINIC MEDICARE RESOURCES, )
LLC, d/b/a MAJESTACARE, )
             Defendant. )


<u>MEMORANDUM OPINION AND ORDER</u>

      This matter is before the Court following a bench trial in this case, which took place on

September 26th and 27th of 2017.  Following the proceedings, the parties were instructed to file

proposed findings of fact and conclusions of law with the Court by January 5, 2018.  Bristol

Anesthesia filed its proposed findings with the Court on January 5, 2018, [Docs. 124 and 125],

and MajestaCare replied, [Doc. 136].  MajestaCare also filed its proposed findings on January 5,

2018, [Doc. 127], to which Bristol Anesthesia replied, [Doc. 128].  This matter is now ripe for

review and final disposition.

## I.      FACTUAL BACKGROUND

      Plaintiff Bristol Anesthesia Services, P.C. ("Bristol Anesthesia" or "BAS") is a medical

practice formed and located in Tennessee that provides anesthesia services to patients at various

healthcare facilities, including Bristol Regional Medical Center ("BRMC"). [Doc. 124 ¶ 1]. From

approximately July 2012 through December 2014, Carilion Clinic Medicare Resources, d/b/a

MajestaCare ("MajestaCare"), a Virginia managed care organization ("MCO"), provided health

insurance coverage to Virginia Medicaid participants, [Doc. 127 ¶¶ 1, 2], pursuant to a contract

with the Virginia Department of Medical Assistance Services ("DMAS").  MajestaCare was paid

a capitated rate by DMAS for each enrollee and MajestaCare was responsible for payment of medical claims submitted by providers for medical care, including anesthesia service provided to Medicaid enrollees. DMAS required MajestaCare to pay providers at least the amount established by a DMAS rate schedule or other negotiated rate. DMAS rates are generally less than that of standard private billing rates. [Doc. 124 ¶ 80].

MajestaCare entered into contracts with various healthcare providers throughout Virginia and northeastern Tennessee to provide services to Virginia Medicaid participants. These providers comprise MajestaCare's "network." [Doc. 127 ¶¶ 3-4]. Some of MajestaCare's "network" providers have privileges or provide care at BRMC, a facility for which Bristol Anesthesia was the exclusive anesthesia provider. [Doc. 127 ¶ 25]. When MajestaCare patients were treated at BRMC and other healthcare centers in Tennessee, Bristol Anesthesia provided anesthesia services to MajestaCare's patients through Bristol Anesthesia's contracts with those healthcare centers. Bristol Anesthesia was never in MajestaCare's approved provider network, and did not enter into any written contract with MajestaCare regarding rates for its services, nor was Bristol Anesthesia under any contract with DMAS to provide services to Virginia Medicaid enrollees. [Doc. 127 ¶ 27; Doc. 124 ¶ 18]. Medicaid insureds, including MajestaCare members, are sometimes covered for services provided by providers who are "out of network," or do not have a contract with the Medicaid plan. [Doc. 127 ¶ 9]. Bristol Anesthesia provided anesthesia services to MajestaCare's patients from about July 2012 to November 2014, when the MajestaCare plan ceased to operate. [*Id*. ¶ 52; Doc. 124 ¶ 30].

MajestaCare contracted with Aetna to manage the plan as a third-party administrator and to negotiate contracts with providers. Aetna's responsibilities included setting up the billing system and processing, adjudicating, and paying claims. [Doc. 127 ¶5; Doc. 124 ¶ 14]. Aetna

developed an algorithm to calculate the appropriate payment for anesthesia services such as those provided by Bristol Anesthesia. Anesthesia claims are billed in "base units" and "time units." [Doc. 127 ¶ 13]. Time units are measured in fifteen-minute increments in Northeast Tennessee. [Doc. 124 ¶ 45]. The total number of units for a particular procedure is then multiplied by a "conversion factor," expressed in dollars. [Doc. 127 ¶ 15]. The DMAS regulated conversion factor was $12.84 per unit from 2012 to 2014. [*Id.* ¶ 17; Doc. 124 ¶ 72]. From July 2012 until August 26, 2013, Bristol Anesthesia billed MajestaCare for anesthesia services on a per unit basis at their standard billing rate based on the American Society of Anesthesiologists' Relative Value Guide. [Doc. 124 ¶¶ 46, 75, 92; *Defendant's Trial Exhibit* 62]. In the absence of a contract to bill a certain rate, Bristol Anesthesia bills all patients the same amount. [*Testimony of Kimberly Hilton, Trial Transcript Vol. II* at 137]. MajestaCare paid for these services, in full or in part, based on the algorithm developed for the plan by Aetna, which used the DMAS reimbursement rate schedule for anesthesia units. [Doc. 127 ¶ 40; Doc. 124 ¶¶ 90-114].

As of January 1, 2012, federal regulations required that anesthesia services be reported in minutes rather than "units." [Doc. 127 ¶ 34]. When Aetna developed the algorithm for anesthesia services, Aetna failed to change the calculation from "units" to minutes as required by the changed regulations. [*Id.* ¶ 35]. MajestaCare states that its "mistake" in the algorithm "resulted in minutes being calculated as if they were time units (15-minute increments), in turn resulting in the time unit used to adjudicate claims being 15 times greater than it should have been." [*Id.*]. As a result, MajestaCare claims that it made overpayments to Bristol Anesthesia as well as other providers of anesthesia services. By late October 2013, the mistake had been noticed and corrected in the algorithm, and MajestaCare began re-adjudicating claims. [*Id.* ¶ 47]. MajestaCare "sent out corrected remittance advices re-adjudicating past reimbursement claims, and applying

overpayments to newly submitted reimbursement claims to resolve overpayments." [*Id*. at ¶ 50]. MajestaCare informed Bristol Anesthesia of the alleged overpayments between July 9, 2012 and August 26, 2013, and its intention to recoup the overpaid amount. [Doc. 124 ¶ 125; Doc. 127 at ¶ 41; *Defendant's Trial Exhibits* 51, 52].

Bristol Anesthesia claims that in the first 13 and a half months, before payments were re-adjudicated, MajestaCare paid 46.4% of Bristol Anesthesia's billed charges. [Doc. 124 ¶ 114]. MajestaCare, however, claims that it paid only 41.2% of the amounts billed by Bristol Anesthesia prior to the re-adjudication. [Doc. 127 ¶ 40]. Beginning on August 27, 2013, MajestaCare began applying a "Q" modifier which resulted in a 50% discount to claims submitted by anesthesiology practices where Certified Registered Nurse Anesthetists ("CRNAs") were involved in performing anesthesiology services. [*Id*. at ¶ 47]. Between the months of August, 2013, and the closure of the MajestaCare plan in November of 2014, Bristol Anesthesia continued to submit bills to MajestaCare for reimbursement in the same manner and at the same rates as before. [*Id.* at ¶¶ 51-52]. Some of the claims MajestaCare approved for payment were approved at the rate of $6.42 a unit or less, because it applied the Q-modifier when services for which "Bristol Anesthesia sought reimbursement was directly performed by a CRNA employed by BRMC and not Bristol Anesthesia." [*Id*. ¶ 51]. Any amount approved during the dates of August 27, 2013 and November 26, 2014 was not paid to Bristol Anesthesia, but was credited to the balance which MajestaCare claimed Bristol Anesthesia owed for the previous overpayments. [*Id.*]

Bristol Anesthesia brought suit against MajestaCare for breach of implied-in-fact contract, *quantum meruit*, and wrongful recoupment, seeking compensatory damages of $368,393.70, the difference between Bristol Anesthesia's standard billing amount and the rate actually paid by

MajestaCare.  [*Complaint* at ¶ 35].[1]  MajestaCare brought a counterclaim for unjust enrichment and restitution based on the same facts as described above. [Doc. 44].  MajestaCare states that when it discovered the mistake, it had made overpayments of $94,623.33, and has recouped only $15,847.93. [Doc. 127 at 19].  MajestaCare therefore claims that it is entitled to judgment for the outstanding amount of $78,775.40. [*Id.*].

## II.  DISCUSSION

### a.  Breach of Implied-in-Fact Contract

Tennessee law recognizes two types of implied contracts, those implied-in-fact and those implied-in-law.  *Angus v. City of Jackson*, 968 S.W.2d 804, 808 (Tenn. Ct. App. 1997).  Implied-in-fact contracts arise under "circumstances which show mutual intent or assent to contract" between the parties.  *Givens v. Mullikin*, 75 S.W.3d 383, 407 (Tenn. 2002) (quoting *Angus*, 968 S.W.2d at 808).  An implied-in-fact contract requires mutual assent, consideration, and a lawful purpose.  *Id.*

> An express oral contract and a contract implied in fact are very similar with the primary difference between them being the manner in which the parties manifest their assent. "In an express contract, the parties assent to the terms of the contract by means of words, writings, or some other mode of expression. . . .  In a contract implied in fact, the conduct of the parties and the surrounding circumstances show mutual assent to the terms of the contract."

*Thompson v. Hensley*, 136 S.W.3d 925, 930 (Tenn. Ct. App. 2003) (quoting *River Park Hospital, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 2002 WL 31302926 at *10 (Tenn. Ct. App. Oct.

---

[1] Bristol Anesthesia has also argued throughout the proceedings that MajestaCare is judicially estopped from contesting the $368,393.70 amount owed to Bristol Anesthesia, because MajestaCare's sworn filings with the Virginia Board of Insurance list this amount as a liability.  [Doc. 125 at 11].  Bristol Anesthesia claims that under Generally Accepted Accounting Principles ("GAAP"), a contested amount such as this must be listed as a "contingent liability," rather than a liability, or amount owed.  However, Bristol Anesthesia did not prove that such GAAP principles are applicable to filings with the Virigina Board of Insurance, only that they are widely used in financial auditing and accounting. [*Trial Transcript Vol. II* at 192-93].  Therefore, this Court will consider the merits of all claims in this case, rather than estop MajestaCare from defending its case or arguing its counterclaim.

11, 2002)). Such surrounding circumstances and additional facts that manifest mutual assent of an implied contract include course of dealing and continued performance. *See Le-Jo Enterprises, Inc. v. Cracker Barrel Old Country Store, Inc.*, 2013 WL 6155622 at *8 (Tenn. Ct. App. Nov. 20, 2013).

Bristol Anesthesia argues that MajestaCare breached an implied-in-fact agreement between the parties beginning in November, 2013, when MajestaCare began "unilaterally paying Bristol Anesthesia for its services at substantially lower rates in accordance with the Medicaid fee-for-service rate schedule set by DMAS." [*Complaint*, Doc. 1 at 7]. Bristol Anesthesia argues that the parties' behavior during the first six months of their relationship demonstrates mutual assent. [Doc. 124 at 28]. Specifically, because MajestaCare paid the claims that Bristol Anesthesia submitted based on the billed rates for a period of at least six months, this sufficiently creates an implied contract by performance. [*Id.*]. Bristol Anesthesia claims that, during the first six months of the parties' relationship, MajestaCare paid 82.7% of the billed charges, and for that reason, MajestaCare is liable for 82.7% of Bristol Anesthesia's total billings. [Doc. 96]. Bristol Anesthesia asserts that its total billed charges amounts to $605,535.00, and 82.7% of that figure is $500,777.45, which it claims under an implied-in-fact contract theory. [*Id.*]. Because MajestaCare has previously paid $114,538.36 before recoupments, however, Bristol Anesthesia claims that this reduces the damages on Count I to $386,239.09.[2]

MajestaCare, however, argues that there was no meeting of the minds between the parties to pay Bristol Anesthesia's "full, standard billing rates for anesthesia services." [Doc. 127 at 11].

[2] Bristol Anesthesia initially miscalculated this amount in its proposed findings of fact and conclusions of law, [Doc. 124 at 28]. In its response to MajestaCare's filing, however, it states that, "Due to a mathematical error, its calculation of damages for MajestaCare's breach of contract was mistaken. To correct this, BAS' Proposed Finding of Fact No. 8 should be revised to assert damages of $386,239.09 (the difference between 82.7% of its billed charges, and MajestaCare's previously recouped payments)." [Doc. 128 at1].

In support of its claim of lack of mutual assent, MajestaCare states that it was not paying Bristol Anesthesia its full billed charges, but instead basing its payments on the DMAS conversion factor. [*Id*.]. Further, it argues that the inadvertent payments, "calculated without regard to Bristol Anesthesia's billings whatsoever … do not manifest an agreement to pay Bristol Anesthesia its billed charges." [*Id*. at 12]. MajestaCare further argues that even if the parties' performance amounted to an implied-in-fact contract, "their post January 25, 2013 performance, with no objection whatsoever from Bristol Anesthesia, amended that contract to reflect reimbursements based on the $12.84 conversation factor, units based on the Procedure Fee File, and a correct calculation of anesthesia time units." [Doc. 127 at 12].

In considering the implied contract claim, the Court must view the payment scheme and behavior between the parties in two time periods. The first time period at issue begins on the date of the inception of the relationship between the parties in July of 2012, and continues through August 26, 2013. This is the time period when MajestaCare consistently paid based on its initial algorithm, and MajestaCare eventually readjudicated all claims during this time. The second time period begins on August 27, 2013, and continues until the end of the parties' relationship on November 26, 2014. Donna Littlepage, current President of MajestaCare, testified at trial as follows:

Q: What is the significance of August 27, 2013 to November 26, 2014?

A: That's where the payment, the claims adjudication software system had been corrected to correct the algorithm and apply a Q modifier both; so now there's no intervention needed, the claims could just go through and pay on their own.

[*Trial Transcript Vol. II* at 14]. MajestaCare summarized the data for all claims for MajestaCare patients treated by Bristol Anesthesia into Defendant's Trial Exhibit 62, which uses this date delineation. Bristol Anesthesia did not object to this exhibit as a summary of the data. [*Id*. at 5].

Therefore, the Court has found sufficient evidence in the record that these date ranges are accurate, and that the two time periods should be analyzed separately.

### i.    Before claims readjudication: July 9, 2012 – August 26, 2013

The first patient treated by Bristol Anesthesia under the MajestaCare plan incurred charges on July 9, 2012. Dr. William Smith, an anesthesiologist and president of Bristol Anesthesia, testified that Bristol Anesthesia physicians treat patients without regard to insurance provider or ability to pay [*Trial Transcript Vol. I.* at 29], and set their billing rates according to the Relative Value Guide. [*Id.* at 32]. Bristol Anesthesia treated patients who were enrolled in the MajestaCare MCO plan at BRMC. The rate Bristol Anesthesia charged on MajestaCare claims was the same amount that it bills for all patient claims. [*Testimony of Kimberly Hilton, Trial Transcript Vol. II.* at 137-138]. MajestaCare paid these billed charges based on the DMAS schedule, but using the algorithm which did not account for the fifteen minute time unit conversion. [Doc. 127 at ¶¶ 33-42]. In some cases, this resulted in a full payment of the charges billed by Bristol Anesthesia. In some other cases, MajestaCare only reimbursed a portion of the charges billed for anesthesia services. *See Plaintiff's Trial Exhibit 24; Defendant's Trial Exhibit 64*.

It is undisputed that the parties were operating under no written contractual agreement during this time period. An expert on the operation and practices of Virginia MCOs testified that, in the absence of a contractual agreement, MCOs would be required to "pay the fee that was charged, the billed charges, because they don't have a contract to pay a different amount if they authorize that service[.]" [*Testimony of MacGregor Gould, Trial Transcript Vol. II* at 78]. However, Patrick Brosnan, the interim Chief Executive Officer at MajestaCare during this dispute, testified that it is "standard practice" for Virginia MCOs to reimburse bills at the Virginia DMAS fee schedule, and include any modifiers that might discount the reimbursement rate, [*Trial*

Transcript Vol. I at 182], and that Bristol Anesthesia accepted such rates without complaint. [*Id*. at 176-77]. The agreement between Virginia DMAS and MajestaCare provides that "out-of-network claims must be paid in accordance with the Medicaid fee schedule[.]" [*Id*. at 154; *Defendant's Trial Exhibits 34, 35, and 36; Plaintiff's Trial Exhibits 13, 14, and15*].

Regardless of what MajestaCare now claims it should have paid Bristol Anesthesia, however, MajestaCare submitted payment at a set rate, without any modifiers, for thirteen months. Bristol Anesthesia accepted these payments when they were received, and there is no evidence that it ever contested the amount it received from MajestaCare. In fact, Bristol Anesthesia's practice manager testified that she did not know that MajestaCare "had anything to do with Medicaid" until she received the recoupment notices. [*Trial Transcript Vol. II* at 184]. Therefore, Bristol Anesthesia had no reason to expect that the reimbursed amounts it was receiving from MajestaCare were incorrect. At trial, Kimberly Hilton, the practice manager for Bristol Anesthesia, testified as follows:

> Q: Prior to receiving notice of the readjudications and then getting remittances showing that readjudicated claims, at no point prior to that did Bristol Anesthesia challenge the reimbursements that it has received from MajestaCare, right?
>
> A: That's correct.
>
> Q: You accepted them as … for what they were?
>
> A: Yes.

[*Trial Transcript Vol. II* at 164]. Ms. Hilton also testified that Bristol Anesthesia "was treating [MajestaCare] just like a regular insurance." [*Id*. at 159], and that it did not object to the remittances when they arrived because they were receiving payments from MajestaCare. [*Id*. at 160].

Bristol Anesthesia, similarly, would not have known that, at least according to its expert, MCOs may be required to pay the full billed amount from out-of-network providers in the absence

of a negotiated rate. Because Bristol Anesthesia accepted these payments for a significant period of time, Bristol's knowledge of what amount MajestaCare *should have paid* is irrelevant in considering whether the parties created an implied-in-fact contract through their performance.

MajestaCare presents evidence that it only reimbursed 41.2% of claims between July 9, 2012 and August 2013, which it hopes will persuade the Court that the parties never mutually assented to any agreed upon charges for anesthesia services. [*Defendant's Exhibit 62*; Doc 127 at ¶ 40]. However, MajestaCare need not pay 100% of Bristol Anesthesia's billed rates in order for the two parties to have mutually assented to an implied-in-fact contract. The very absence of a written agreement makes it clear that Bristol Anesthesia was not billing a rate the parties had mutually negotiated. It is the actions and performance of the parties that make up the "surrounding circumstances" the Court will consider when determining if the parties mutually assented to an implied contractual agreement. *Thompson*, 136 S.W.3d at 930. Neither is MajestaCare's lack of knowledge regarding any unilateral mistake in its algorithm relevant, because it paid Bristol Anesthesia's billed charges in the same manner for an extended period of time.

Bristol Anesthesia billed MajestaCare at its regular rate, and MajestaCare paid Bristol Anesthesia based on the rate produced by its own algorithm, without the conversion factor for time units, and Bristol Anesthesia accepted these reimbursed payments. The parties behaved in this manner for at least thirteen months, between the dates of July 9, 2012 and August 26, 2013. Between these dates, the parties sufficiently manifested mutual assent to an implied-in-fact, at-will contract for the payment of Bristol Anesthesia's billed charges at the rate at which MajestaCare performed, and Bristol Anesthesia accepted.

Now that the Court has found that an implied-in-fact contract existed during this time period, it now must determine the amount that Bristol Anesthesia is owed for its services for this

time period.  Bristol Anesthesia claims that, because MajestaCare reimbursed 82.7% of all charges billed within the first six months, MajestaCare is liable for the same percentage of all billed charges.  [Doc. 124 at 28].  The Court is not persuaded that Bristol Anesthesia is due 82.7% of its total billed charges simply because that is how MajestaCare behaved for an arbitrarily selected number of months.  When asked why six months was the dispositive amount of time to determine the percentage Bristol Anesthesia was due, the only answer presented at trial is that it "reflects the market," and was based on the judgment of Bristol Anesthesia and its accounting team.  [*Testimony of James Teed, Trial Transcript Vol. II* at 246-49].  A wider lens of the parties' performance indeed reveals that MajestaCare reimbursed Bristol Anesthesia for less than half of the total billed charges between July 9, 2012 and August 26, 2013, and that Bristol Anesthesia also accepted those payments.

Rather, as the implied-in-fact contract between the parties is based on their behavior of paying and accepting the amount MajestaCare submitted to Bristol Anesthesia, that amount is the appropriate remedy.  Bristol Anesthesia is due the amount that MajestaCare allowed, and paid, between the dates of July 9, 2012 and August 26, 2013, before it attempted to recoup those payments.  Plaintiff's trial exhibit 24 and defendant's trial exhibit 64, which are the same document, provide the amount that Bristol Anesthesia billed to MajestaCare, and the amount "allowed" by MajestaCare.  This spreadsheet demonstrates that MajestaCare reversed, or recouped that amount, and readjudicated the claim, reducing the "allowed" amount based on their miscalculation.  Bristol Anesthesia is entitled to the initial amount that was "allowed" by MajestaCare.

     ii.     *After claims readjudication: August 27, 2013 – November 26, 2014*

It is well settled that "contracts for an indefinite duration are generally terminable at will by either party with reasonable notice." *McReynolds v. Cherokee Ins. Co.*, 896 S.W.2d 777, 789 (Tenn. Ct. App. 1994). Because the implied-in-fact contract discussed above was based on the continued performance of both parties, and not by a communicated agreement, it was an at-will contract, which could be terminated by either party. The facts in this case are clear that upon the discovery of its unilateral error in the payment algorithm, MajestaCare no longer assented to the payment of Bristol Anesthesia's bills at its prior fee schedule. Instead, MajestaCare began to reimburse Bristol at a rate which took the time units into account, and applied a 50% discount modifier for certain patient claims. This change in MajestaCare's fee disbursement terminated the previous implied-in-fact contract for the payment of Bristol Anesthesia's billed charges at the original rate it paid between July 9, 2013 and August 26, 2013.[3] Finding the original implied-in-fact contract was terminated when MajestaCare refused to continue to pay in the same manner as the previously approved amounts, the Court must now decide if the parties' actions going forward, and through the end of the parties' relationship in November of 2014, sufficiently manifested mutual assent enough to find that a second implied-in-fact contract was created between the parties during this time.

The parties report that representatives from both Bristol Anesthesia and MajestaCare participated in a conference call in July of 2014 to discuss the readjudication and rate adjustment.

---

[3] Bristol Anesthesia urges the Court to terminate any implied-in-fact contract created by the parties' performance on or about October 22, 2013, which is the date MajestaCare claims it "notified Bristol of the mistake and the rates at which it would reimburse anesthesia claims going forward." [Doc. 127 at 13]. However, while the notification date is relevant to determining whether the contract was terminated with reasonable notice, that date is unclear from the testimony. Ms. Hilton testified that she first received remittance advice from MajestaCare on December 13, 2013, though some of the forms included the date of November 19, 2013. [*Trial Transcript Vol. II* at 169-70]. The parties did not officially discuss a new payment scheme until July 2, 2014, on a conference call. Further, MajestaCare actually began performing differently at a much earlier date than October 2013, because claims submitted by Bristol Anesthesia on August 27, 2013 and onward were reimbursed with the time unit conversion and Q modifier application. Therefore, the Court finds that the previous contract was terminated on August 27, 2013, when MajestaCare began paying Bristol Anesthesia differently than it had previously.

[*Trial Transcript Vol. I* at 137; *Vol. II* at 209-10]. The purpose of the call, from Bristol Anesthesia's point of view, was to "get paid because, remember, we hadn't been paid in months." [*Testimony of James Teed, Trial Transcript Vol. II* at 240]. By the time the phone call took place, representatives from Bristol Anesthesia clearly understood that MajestaCare was an MCO that would only reimburse at the DMAS fee schedule rate of $12.84 a unit, and that the previously remitted amount represented a miscalculation in MajestaCare's payment algorithm. It appears from the testimony that the dispute related to calculating payments was focused not on the miscalculation of the time units, but the application of the 50% discount modifier. James Teed, certified public accountant and consultant for Bristol Anesthesia, testified at trial: "We asked to begin with during the conversation … for an explanation for why we were getting paid $5.00 to $6.00 a unit and DMAS was paying us $12.84 a unit per their fee schedule[.]" [*Trial Transcript Vol. II* at 210].

The record in this case indicates that during the July 2014 conference call, Bristol Anesthesia attempted to negotiate a contract with MajestaCare. [*Testimony of James Teed, Trial Transcript Vol. II* at 240]. This attempt was unsuccessful, and the parties apparently terminated the phone call having not agreed on a negotiated rate going forward. Nonetheless, Bristol Anesthesia continued to treat patients enrolled in the MajestaCare plan and submit bills to MajestaCare for payment. MajestaCare approved these amounts at the new rate, but did not pay them, because it felt it was due recoupment from the overpayments made before the mistake in the algorithm was discovered. Instead, MajestaCare credited that amount against the balance it claimed Bristol Anesthesia owed MajestaCare. The parties continued in this fashion from August 27, 2013 until November 26, 2014, when the last MajestaCare enrollee incurred charges from Bristol Anesthesia.

It is clear that during this time period the surrounding circumstances indicate that the parties did not manifest mutual assent necessary to find that an implied-in-fact contract existed between the parties. First, the parties attempted to resolve their payment dispute unsuccessfully. The conference call between the parties suggests that they did not agree on the application of the 50% discount Q modifier to the DMAS rate. Therefore, this Court has undisputed evidence in the record that shows that the parties could agree neither on the rate MajestaCare should pay to Bristol Anesthesia, nor whether that amount should be offset to an alleged debt or paid directly to Bristol Anesthesia.

In some circumstances, Bristol Anesthesia's treatment and billing of MajestaCare patients following the readjudication, coupled with its lack of appeal to MajestaCare, might lead a court to infer that it assented to the new rate based on *its* continued performance. If Bristol Anesthesia had accepted payments from MajestaCare at the rate of $6.42 or less per unit, it may be said that it assented to perform anesthesia services at that rate of reimbursement from MajestaCare. That, however, is not the case here. Therefore, the second distinguishing factor between this time period and the first is that Bristol Anesthesia had no opportunity to accept payments for services from MajestaCare. This amount was credited against a balance that Bristol Anesthesia disputed. It is clear that Bristol Anesthesia regarded this credit not as an offset, but as MajestaCare "not paying us anything for current services." [*Testimony of James Teed, Trial Transcript Vol. II* at 241].

Finally, there is evidence in the record that Bristol Anesthesia's contract with BRMC required it to provide services to all patients at BRMC. [*Testimony of Kimberly Hilton, Trial Transcript Vol. II* at 168]. Therefore, Bristol's Anesthesia's continued treatment of MajestaCare patients was provided as a contractual obligation with another party, and does not, by itself, evidence its assent to receive payment from MajestaCare at approximately half of the DMAS rate.

For these reasons, the surrounding circumstances do not provide sufficient evidence that the parties mutually assented to an implied-in-fact contractual agreement during the period from August 27, 2013 to November 26, 2014.

      b. *Quantum Meruit*

In Tennessee, a claim for *quantum meruit* provides an "equitable substitute" for a contract where a party may recover a "reasonable value of goods and services provided" if certain circumstances are shown. *Doe v. HCA Health Svcs. of Tenn., Inc.*, 46 S.W.3d 191, 197-98 (Tenn. 2001). In order to state a viable *quantum meruit* claim, the plaintiff must show (1) there is no existing, enforceable contract between the parties regarding the same matter; (2) the party seeking recovery provided valuable goods and services; (3) the party to be charged received those goods or services; (4) the circumstances of the transaction indicate that the parties should have reasonably understood that the service provider expected to be compensated; and (5) the circumstances demonstrate it would be unjust for the receiver to retain the goods or services without payment. *Id.* In the absence of an enforceable agreement between the parties, *quantum meruit* "requires a defendant to pay a plaintiff a reasonable value of services performed for the defendant." *Son v. Coal Equity, Inc.*, 122 Fed. App'x 797, 801 (6th Cir. 2004) (quoting *United States v. Snider*, 779 F.2d 1151, 1159 (6th Cir. 1985)). For this reason, *quantum meruit* recoveries are limited to the actual, reasonable value of the goods or services, not their contract price. *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995). Further, a party that had a contract at one time may still pursue a *quantum meruit* theory if the contract is no longer enforceable. *Id.*; *Cooksey v. Shanks*, 136 S.W.2d 57, 59 (Tenn. Ct. App. 1939).

Bristol Anesthesia argues that, if the Court does not find that an implied-in-fact contract existed between the parties, it is "entitled to *quantum meruit* recovery for the reasonable value of

the valuable medical services it provided to MajestaCare's insureds under circumstances indicating that MajestaCare and its insureds reasonably understood that BAS expected compensation and that it would be unjust for BAS not to be reasonably compensated for providing those services." [Doc. 124 at 30]. Bristol Anesthesia states that the best gauge for the reasonable value of the anesthesia services it provided is the billed rates of other anesthesia providers in Northeast Tennessee [*Id*. at 31]. Because these rates are comparable to those billed by Bristol Anesthesia, it seeks in *quantum meruit* damages the same amount as in Count I: the total charged amount less the payments made by MajestaCare, or $386,239.09. [*Id*.].

MajestaCare argues that Bristol Anesthesia cannot establish the necessary elements of its *quantum meruit* claim. First, MajestaCare argues that Bristol Anesthesia's "provision of anesthesia services to MajestaCare members after MajestaCare explained what it was offering to reimburse created a unilateral contract under Tennessee law." [Doc. 127 at 15]. For that reason, MajestaCare argues that Bristol Anesthesia cannot demonstrate the lack of an existing, enforceable contract. MajestaCare further argues that because Bristol Anesthesia's services are provided to patients from whom it could seek reimbursement directly, MajestaCare is not a "party to be charged" for goods or services received. [*Id*.].

### i. *Before claims readjudication: July 9, 2012 – August 26, 2013*

There is no need to discuss this alternative claim further as it relates to the first time period at issue, July 9, 2012 through August 26, 2013, as the Court has already determined that the parties did indeed enter into an enforceable implied-in-fact contract during those dates. Because recovery under a *quantum meruit* theory requires that the parties did not enter into an enforceable contract, Bristol Anesthesia cannot recover for damages sustained during this time period under a *quantum meruit* theory. *Doe*, 46 S.W.3d at 197-98.

*ii.* *After claims readjudication: August 27, 2013 – November 26, 2014*

This Court has found that the conduct of the parties and the surrounding circumstances between the dates of August 27, 2013 and November 26, 2014 show that the parties did not mutually assent to enter into a contract for the payment of anesthesia services. Therefore, the Court will now consider whether *quantum meruit* recovery is appropriate for this time period.

The first element that a party must show to recover under a *quantum meruit* theory is the lack of an enforceable contract. The record is clear that no written agreement existed between the parties for a negotiated rate of reimbursement, and the conduct of the parties during this time period cannot support the contention that an implied-in-fact contract existed following MajestaCare's readjudication of the claims. MajestaCare argues, however, that a unilateral contract is present in this case, because, "once MajestaCare corrected the mistaken claim algorithm and began applying supervision codes, Bristol Anesthesia was on notice of how MajestaCare was offering to reimburse anesthesia claims for its members." [Doc. 127 at 15]. MajestaCare claims that since Bristol Anesthesia was under no legal obligation to provide anesthesia services to MajestaCare members, its continued provision of those services after August 27, 2013 created a unilateral contract. [*Id.*].

A unilateral contract is present when an offeror makes a promise to an offeree, who "renders some performance as acceptance." *Rode Oil Co., Inc. v. Lamar Advertising Co.*, 2008 WL 4367300 at *6 (Tenn. Ct. App. Sept. 18, 2008). The offer cannot be accepted, however, unless the terms of the contract to be formed are "reasonably certain," or if they "provide a basis for determining the existence of a breach as well as an appropriate remedy." *Memphis Light, Gas & Water Div. v. Comcast of Ark./Fla./La./Minn./Miss./Tenn., Inc.*, 2016 WL 8376738 at *4 (W.D. Tenn. Mar. 30, 2016).

MajestaCare's argument that the parties entered into a unilateral contract must be rejected. First, there is a "long-established presumption against finding a unilateral rather than bilateral contract where there is doubt as to which type of contract was intended." *Rode Oil Co., Inc.*, 2008 WL 4367300 at *6. Additionally, it appears from the record that no reasonably certain terms were discussed that would allow Bristol Anesthesia to "exactly and precisely accord with the terms of the offer." *Allen v. Nat'l Advertising Co.*, 798 S.W.2d 766, 768 (Tenn. Ct. App. 1990). MajestaCare expressed an intent to pay rates at the DMAS fee schedule, but the amounts allowed to Bristol Anesthesia were less than this amount because of the application of discount modifiers. The parties were never able to negotiate a rate for Bristol Anesthesia's services, nor could they agree on the appropriate application of the modifiers that reduced the reimbursed rate by 50% or more. For these reasons, no sufficiently certain offer was communicated by MajestaCare to Bristol Anesthesia that would allow it to accept through its performance. Therefore, the Court concludes that there was no existing and enforceable contract between the parties during this time period.

It is clear that the second element of Bristol Anesthesia's *quantum meruit* claim is met, as it is undisputed that Bristol Anesthesia provided valuable services to MajestaCare insureds. MajestaCare disputes the third element, however, claiming it was not the party to be charged which received the goods and services, because Bristol Anesthesia could seek reimbursement directly from the patients, who are "primarily responsible for the charges for the services they are provided." [Doc. 127 at 15-16]. Notwithstanding the patient's ultimate responsibility for payment of bills remaining after MajestaCare reimburses Bristol Anesthesia, MajestaCare accepted and approved Bristol Anesthesia's bills when it could have denied coverage. [Doc. 128 at 5]. MajestaCare agreed through its acceptance of those charges that it was a "party to be charged" for Bristol Anesthesia's services.

MajestaCare admits that the fourth and fifth elements of Bristol Anesthesia's claim are met because the parties "do not dispute that Bristol Anesthesia should be reimbursed *some* amount for the services it provided MajestaCare members." [Doc. 127 at 16].  It is clear then that, because Bristol Anesthesia performed valuable services that benefitted MajestaCare insureds, and that MajestaCare approved claims for payment, it would be unjust for Bristol Anesthesia to receive no compensation for these services. Therefore, having found that all elements for *quantum meruit* recovery are present in the parties' dealings between August 27, 2013 and November 26, 2014, this Court finds that Bristol Anesthesia is entitled to the fair and reasonable value of its services provided during this time frame.

A wealth of evidence was presented regarding the fair market value of the anesthesia services.  Dr. Smith testified that Bristol Anesthesia sets its billed rates based on the Relative Value Guide, a standard industry practice in setting rates for anesthesia services. [*Trial Transcript Vol. I* at 31-37].  Bristol Anesthesia thus argues that its billed rate represents the fair market value for such services. [Doc. 124 at 30-31].  MajestaCare argues that the rates it reimbursed after it corrected the mistake and applied the discount modifier were "consistent with what Bristol Anesthesia has accepted, and continues to accept, from other Virginia MCOs." [Doc. 127 at 17].

It is clear that Bristol Anesthesia officially became aware that MajestaCare was an MCO under contract with DMAS at some point during this time frame, if not before.  Therefore, Bristol Anesthesia could reasonably expect that MajestaCare would reimburse at the DMAS conversion factor rate of $12.84, consistent with its experience with DMAS.  Kimberly Hilton, practice manager for Bristol Anesthesia, testified that claims submitted through DMAS were paid at a conversion factor rate of $12.84 per unit of anesthesia, and that Bristol Anesthesia had accepted that rate from DMAS.  [*Trial Transcript Vol. II* at 145].  It is clear that Bristol Anesthesia treated

all patients who required their services at BRMC, including Medicaid patients, and thus was familiar with the Medicaid billing schedule. Therefore, the calculation of the reasonable value of anesthesia services must be considered in context of the treatment of Medicaid patients, such as those insured by MajestaCare. The fair value should thus reflect the Medicaid reimbursement schedule, rather than what Bristol Anesthesia could expect to receive from a private insurer.

Next the Court must consider whether the application of the 50% discount Q modifier is appropriate when considering the reasonable value of Bristol Anesthesia's services. The modifier at issue was applied by MajestaCare in cases where it claimed an anesthesiologist from Bristol Anesthesia was supervising CRNAs at BRMC; therefore, it reasoned, only half of the DMAS reimbursement should be paid to Bristol Anesthesia. This Court heard testimony that such modifiers were created by the Centers for Medicare & Medicaid Services ("CMS") [*Trial Transcript Vol. II* at 140-41]. Mr. Teed testified that the 50% discount Q modifier could be appropriately applied in Medicare reimbursements, but not in Medicaid cases. [*Id*. at 210-11; 219]. He further testified that during the July 2014 conference call, he "asked repeatedly what was the basis for [the modifier] and [Mr. Brosnan] never did answer the question as to why." [*Id*. at 221]. During Mr. Brosnan's testimony, he testified that, based on his experience, "it is standard practice to use the modifier." [*Trial Transcript Vol. I* at 135]. He also provided the following testimony:

> Q: You are aware that in 2013 that Virginia DMAS, Virginia Medicaid, did not reduce claims by 50 percent when a CRNA was medically directed by an anesthesiologist?
>
> A: Am I aware, no, I'm not aware. …
>
> Q: MajestaCare never told DMAS that it was going to pay only 50 percent of the DMAS rate for some claims; did it?
>
> A: I did not tell DMAS.
>
> Q: Do you know if anyone ever told DMAS?

A: Not that I'm aware of. …

Q: MajestaCare did not pay any CRNAs the other 50 percent; correct?

A: I'm not sure. I don't know.

[*Trial Transcript Vol I.* at 131, 133].

It appears that the Q modifier was applied based on the belief that including them was "standard practice" in some areas. MajestaCare was not granted authority to apply such a discount by DMAS, and it did so without reporting this billing practice to DMAS. While CMS regulations permit the use of the 50% discount Q modifier, Virginia DMAS has chosen not to use them. [*Id.* at 127-30; 311, 317]. MajestaCare's contract with DMAS provided that out-of-network providers, such as Bristol Anesthesia, should be reimbursed at the conversion factor rate of $12.84 a unit, the regular DMAS rate. Trial testimony confirmed that nonparticipating providers, such as Bristol Anesthesia, would be paid "at the Medicaid rates or DMAS rates." [*Trial Transcript Vol. I* at 152]. This rate also appears to be the one that Bristol Anesthesia could have reasonably expected to receive for their services to Medicaid patients, having billed through Virginia DMAS in the past.

Therefore, the reasonable value of anesthesia services provided to parties enrolled in an MCO can fairly be said to track the DMAS conversation factor. However, the 50% discount modifier was applied arbitrarily, and without authority from DMAS. Finding thus, Bristol Anesthesia is entitled to recover $12.84 per unit on all patient claims billed between the dates of August 27, 2013 and November 26, 2014 on a theory of *quantum meruit*.

c. *Wrongful Recoupment & Unjust Enrichment*

Bristol Anesthesia's third claim in its complaint is for wrongful recoupment of the funds MajestaCare overpaid between July 9, 2012 and August 26, 2013. Bristol Anesthesia argues that MajestaCare "improperly readjudicated claims to create an asserted deficiency balance, and

subsequently approved payments to BAS without actually issuing payments to BAS, and instead applying credits to the alleged balance owed by BAS to MajestaCare." [Doc. 124 at 31]. Bristol Anesthesia claims that because there was no mutual mistake between the parties, and because equity and good conscience requires that Bristol Anesthesia retain reimbursed payments, recoupment by MajestaCare was improper.

MajestaCare claims that "MCOs that operate under contract with a particular state to insure the state's Medicaid recipients follow the regulatory framework applicable to the state agency with which they have contracted." [Doc. 127 at 18]. MajestaCare's support for this proposition comes from Mr. Brosnan's testimony that recoupment within a year after the discovery of the mistake is how the "industry works." [*Id.*; *Trial Transcript Vol. I* at 170-71]. MajestaCare cites to the definition of "overpayment," ("the amount paid by a Medicaid agency to a provider which is in excess of the amount that is allowable for services furnished under section 1902 of the Act and which is required to be refunded under section 1903 of the Act.") and "recoupment," ("any formal action by the State or its fiscal agent to initiate recovery of an overpayment without advance official notice by reducing future payments to a provider.") in the federal regulations in support of its claim. 42 C.F.R. § 433.304.

It is clear that MajestaCare relies on the CMS rules for guidance. However, MajestaCare, as a private, for-profit MCO, does not fall under the category of a "Medicaid agency," as provided in the regulations. *See* 42 C.F.R. § 400.203 ("Medicaid agency or agency means the single State agency administering or supervising the administration of a State Medicaid plan."). It was established at trial that MajestaCare receives a capitated rate based on its members from the State agency, [*Testimony of Patrick Brosnan, Trial Transcript Vol. I* at 148], and then contracts

separately with providers to form a network. Similarly, the federal regulations refer to recoupment as "formal action by the State," which is not implicated here.

Further, the federal regulation that allows recoupment of Medicaid overpayments to providers applies to "(1) Overpayments made to providers that are discovered by the State; (2) Overpayments made to providers that are initially discovered by the provider and made known to the State agency; and (3) Overpayments that are discovered through Federal reviews." 42 C.F.R. § 433.310(a)(1)-(3). MajestaCare's unilateral mistake in the algorithm was discovered not by a state agency such as DMAS, Bristol Anesthesia as the relevant provider, nor through a federal review, but by the audit team at MajestaCare. [*Trial Transcript Vol. I* at 167]. For these reasons, this Court finds that the CMS regulations on which MajestaCare relies neither allow nor require the recoupment of funds from Bristol Anesthesia.

The Court will now consider MajestaCare's claim that recoupment is proper under Tennessee law because Bristol Anesthesia was unjustly enriched by the overpayments. The elements of an unjust enrichment claim are (1) a party conferred a benefit upon another party; (2) the enriched party appreciated this benefit; (3) retention of this benefit by the enriched party would be inequitable. *Freeman Indust., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525-26 (Tenn. 2005); *Bennett v. Visa U.S.A., Inc.*, 198 S.W.3d 747, 755-56 (Tenn. Ct. App. 2006). "The most significant requirement of an unjust enrichment claim is that the benefit to the [enriched party] be unjust." *Bennett*, 198 S.W.3d at 755-56. MajestaCare argues that the initial overpayments to Bristol Anesthesia amount to $94,623.33, of which MajestaCare recouped $15,847.93. [Doc. 127 at 19]. MajestaCare thus claims that it is entitled to recoup the remaining $78,775.40, because allowing Bristol Anesthesia to retain the overpaid amount would be inequitable. [*Id.*].

MajestaCare relies on *Burkhart v. U.S. Commerce Equip. Fin., LLC*, 2001 WL 984915 (Tenn. Ct. App. 2001), which interprets Missouri law to find that one circumstance in which equity may require the return of money is when that money was received "due to a mistake." *Id.* at *8. However, *Burkhart* also provides that the "converse of the rule is that one cannot recover a payment made to another, even if made my mistake, if the one to whom the payment is made may in good conscience retain the money." *Id.* (citing *Leach v. Cowan*, 140 S.W. 1070, 1077 (Tenn. 1911)). The court in *Leach* expanded on this proposition as follows:

> Under the agreement so reached the claim was allowed and paid. Under such circumstances the complaining parties will stand in the attitude of one who makes a voluntary payment of money, knowing all the facts, and subsequently sues to recover it. In cases of that kind, the general rule is there can be no recovery, even if there was no legal liability to pay in the first instance. … We are not to be understood as holding that there is absolutely no case in which money or property paid or conveyed under mistake of law can be recovered. There may be such a recovery, even though the transaction was made under a mistake of law; but it must be under such circumstances as the court can see that it would be unconscionable for the party who obtained the advantage in such transaction or settlement to retain that advantage, and e converso, although there was a clear mistake of law, yet the party benefitting by the transaction may retain the advantage in good conscience, neither a court of law nor equity will give relief to the complaining party.

*Leach*, 140 S.W. at 177.

In this case, Bristol Anesthesia did receive compensation from MajestaCare, but it was in exchange for anesthesia services, and in an amount reasonable for the reimbursement of such services. MajestaCare did not fully reimburse Bristol Anesthesia's billed rates; the average billed amount approved by MajestaCare was 41.2% during the relevant period. [*Defendant's Trial Exhibit 62*]. Therefore, it is unclear whether MajestaCare provided a benefit to Bristol Anesthesia at all, when Bristol Anesthesia was only reimbursed for 41.2% of its billed charges after it provided anesthesia services to MajestaCare insureds.

It is clear from the relevant law on wrongful recoupment and unjust enrichment that the primary determination this Court must make is whether the retention of overpaid funds by Bristol Anesthesia would be inequitable. Bristol Anesthesia was reimbursed by MajestaCare at less than half of its billed rates, during a time when Bristol Anesthesia was not aware of MajestaCare's status as a Virginia MCO. For this reason, Bristol Anesthesia had no reason to believe that the amounts it was being reimbursed from MajestaCare were incorrect, and accepted these payments for its services. The mere fact that MajestaCare's unilateral mistake resulted in payments approved above the traditional DMAS calculation does not make the reimbursed amount inequitable. It has been well established at trial that nothing prevents MajestaCare from paying rates much higher than DMAS. Further, MajestaCare failed to notice that its algorithm was incorrect, purportedly paying anesthesia providers fifteen times its intended amount, for thirteen months. An examination of MajestaCare's payment history and algorithms would have, and ultimately did, reveal the mistake. Therefore, as in *Leach*, the claims submitted to MajestaCare were approved and paid voluntarily by MajestaCare, who knew or could have known all the facts necessary to submit the proper payment amount.

MajestaCare had no authority to recoup amounts paid to providers over the DMAS rate or because of its own calculation error. This Court thus concludes that recoupment by MajestaCare of funds it paid to Bristol Anesthesia due to its own unilateral mistake was improper and inequitable.

### III.    CONCLUSION

For the reasons stated herein, the Court finds that an implied-in-fact contract existed between the parties for payment of anesthesia services between the dates of July 9, 2012 and August 26, 2013. Further, the Court finds that MajestaCare wrongfully recouped overpayments

made to Bristol Anesthesia for the patient claims readjudicated during the same timeframe. Therefore, on its implied-in-fact contract and wrongful recoupment claims, Bristol Anesthesia is entitled to retain the amount that MajestaCare approved for payment during the dates of July 9, 2012 and August 26, 2013.[4]

During the time period of August 27, 2013 and November 26, 2014, this Court finds that Bristol Anesthesia is entitled to *quantum meruit* remedies of the fair value of the anesthesia services provided to Medicaid patients, determined using the Virginia DMAS fee schedule, of $12.84 per unit. The 50% discount modifier was inappropriately applied to any payments remitted or credited to Bristol Anesthesia and should not be applied here. This Court has determined that it does not have all the information required to calculate the amount owed. It is hereby **ORDERED** that the parties shall submit a joint calculation of the amount owed, based on the above schedule of $12.84 per unit approved between August 27, 2013 and November 26, 2014, on or before **Wednesday, March 28, 2018**. If the parties do not agree on the final amount, the parties may file separate calculations, explaining any disagreement and difference in amount.

MajestaCare's claim for unjust enrichment and restitution is **DISMISSED**.

A separate judgment will enter, pending the submission to and final accounting of these damages by this Court

So ordered.

ENTER:

_____
s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE

---

[4] According to defendant's trial exhibit 62, MajestaCare allowed $115,385.51 during this time frame. The amount actually paid by MajestaCare was slightly less: $114,538.36. Bristol Anesthesia is due the amount that MajestaCare allowed for payment.